IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FORCE MOS TECHNOLOGY, CO, LTD.,( CAUSE NO. 2:22-CV-460-JRG
                                )
          Plaintiff,            (
                                )
vs.                             (
                                )
ASUSTEK COMPUTER, INC.,         ( MARSHALL, TEXAS
                                ) FEBRUARY 13, 2025
          Defendant.            ( 8:30 A.M.
_____

VOLUME 5

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFF:    DICKINSON WRIGHT, PLLC
                      607 W. 3RD STREET, SUITE 2500
                      AUSTIN, TEXAS  78701
                      (512) 777-4200
                      BY: MR. CHRISTOPHER HANBA

                      DICKINSON WRIGHT, PLLC -
                      MICHIGAN
                      2600 W. BIG BEAVER ROAD
                      SUITE 300
                      TROY, MICHIGAN  48084
                      (313) 223-3084
                      BY:  MS. ARIANA PELLEGRINO

                      HALTOM & DOAN
                      6500 SUMMERHILL ROAD
                      CROWN EXECUTIVE CENTER
                      SUITE 100
                      TEXARKANA, TEXAS  75503
                      (903) 255-1000
                      BY:  MR. JOSHUA THANE

FOR THE DEFENDANTS:   LUMENS LAW GROUP, PLLC
                      8501 N. MACARTHUR BLVD.
                      SUITE 631009
                      IRVING, TEXAS  75063
                      (214) 627-9955
                      BY:  MR. LI CHEN

                      BENESCH, FRIEDLANDER,
                      COPLAN & ARONOFF
                      71 SOUTH WACKER, SUITE 1600
                      CHICAGO, ILLINOIS  60606
                      (872) 302-6466
                      BY:  MR. CHARLES McMAHON
                           MS. KATHLEEN LYNCH
                           MR. TRON FU
                           MR. THOMAS DaMARIO

                      GILLAM & SMITH, LLP
                      102 N. COLLEGE, SUITE 800
                      TYLER, TEXAS  75702
                      (903) 934-8450
                      BY:  MR. TRAVIS UNDERWOOD

OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
                        100 E. HOUSTON STREET
                        MARSHALL, TEXAS  75670
                        (903) 923-8546

THE COURT:  Be seated, please.

Counsel, are there items from the list of pre-admitted exhibits that were used during yesterday's portion of the trial that need to be read into the record?

MR. THANE:  Your Honor, just one--JX 47 needs to be moved into evidence.

THE COURT:  All right.  Any objection from Defendant?

MR. DaMARIO:  No objection, Your Honor.

THE COURT:  And I assume Defendant doesn't have anything further to add in that regard?

MR. DaMARIO:  That's correct, Your Honor.

THE COURT:  All right.  Thank you, counsel.

I'm about to bring if the jury and proceed to instruct them orally on the law to apply in deciding this case followed by closing arguments from the counsel for the competing parties.

I want to make this clear to everyone, including those in the gallery.  The Court considers its final instructions to the jury and counsels' closing arguments to be the most serious part of an inherently serious process.  Therefore, I do not want any distractions I do not want any interruptions.

If you need to come or go, do it now.  If you need to rustle papers, do it now.  If you need to do anything that makes any noise or causes any possible disruption, do it now

before I bring in the jury.

Once the jury is in the courtroom and in the jury box, I don't want any movement, I don't want any talking, I don't want any whispering, I don't want anything that could be a disruption or interruption to the process.  And for goodness sake, I don't want any electronic devices making noises.  So make double sure that you're well positioned with regard to any devices you might have.

All right.  Counsel, do you have anything for me before I bring in the jury and proceed with the Court's final instructions?

MR. HANBA:  No, Your Honor.

MR. McMAHON:  No, Your Honor.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen. Please be seated.  Welcome back.

Ladies and gentlemen of the jury, you've now heard all the evidence in this case, and I'm now going to instruct you on the law that you must apply.

I want you to understand that these final instructions I'm giving you orally this morning are also going to be represented by a printed copy of the same instructions in writing.  And I have prepared eight individual copies of these

instructions, and I intend to send them into the jury room when you retire to deliberate.

So you will each have your own printed copy of these instructions I'm about to give you orally, and you can review them and refresh your memory with regard to them during your deliberations.

I do that because I do not want you to feel compelled to take notes while I give you these instructions orally.  I want you to pay close attention as I give them to you orally, understanding you're going to have your own printed copy to review during your deliberations.

It's your duty to follow the law as I give it to you.  On the other hand, and as I've said, you, the jury, are the sole judges of the facts in this case.  Now, do not consider any statement that I have made over the course of the trial or may make in the course of these instructions as any indication that I have any opinion about the facts in this case.

You're about to hear closing arguments from the attorneys for both of the competing parties.  Statements and arguments of the attorneys, ladies and gentlemen, are not evidence and they are not instructions on the law.  They are intended only to assist you, the jury, in understanding the evidence and the parties' competing contentions.

Now, a verdict form has been prepared for you, and you will take this form with you to the jury room.  And when you

have reached a unanimous decision as to the answers to those questions in the verdict form, you will have your foreperson fill in those unanimous answers to those questions, sign the verdict form on behalf of the jury, date it, and advise the Court Security Officer that you, the jury, have reached a verdict.

Answer the questions in the verdict form from the facts as you find them to be.  Do not decide who you think should win this case and then answer the questions to reach that result.  Again, ladies and gentlemen, your answers to those questions in the verdict form must be unanimous.

Now, in determining whether any fact has been proven in this case, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them, and you may consider all the exhibits presented as evidence during the trial, regardless of who may have presented it or introduced it.

You, the jury, are the sole judges of the credibility of each and every one of the witnesses and the weight and effect to give to all the evidence.  In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You alone are to determine questions of credibility or truthfulness for each of the witnesses.

In weighing the testimony of the witnesses, ladies and

1030

gentlemen, you may consider the witness' manner and demeanor on the witness stand, any feelings or interest they may have in the case or its outcome, any prejudice or bias they may have about the case, and you may consider the consistency or inconsistency of their testimony, considered in the light of the circumstances.  Has the witness been contradicted by other evidence?  Has he or she made statements at other times and in other places contrary to what they said on the witness stand?  You, the jury, must give the testimony of each witness the amount of credibility and weight that you think it deserves.

You must also keep in mind, ladies and gentlemen, that a simple mistakes does not mean that a witness is not telling the truth.  You must consider whether any misstatement was an intentional falsehood or a simple lapse in memory and what significance should be attached to that testimony.

As I've told you previously, the attorneys in this case are advocates for their competing clients, and they have a duty to object when they believe evidence is offered that should not be admitted under the rules of the Court.

When the Court sustained an objection to a question addressed to a witness, you must disregard that question entirely, and you may draw no inference from its wording or speculate about what the witness would have said if I had allowed them to answer the question.

On the other hand, if the objection was overruled, then

you must treat the answer to that question just as you would treat any other answer to any other question as if the objection had not been made.

Now, by allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court in so doing did not indicate any opinion as to the weight or effect of the evidence.  Again, that is solely your responsibility.

Also, at various times during the trial it's been necessary for the Court to talk with the attorneys outside of your hearing, either here at the bench or by calling a recess and talking to them while you were outside of the courtroom.  This happens because often during trials things arise that do not involve the jury.  You should not speculate or guess about what was said during such discussions that took place outside of your hearing or your presence.

Now, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect or circumstantial evidence.  That is, the proof of a chain of circumstances that indicates the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct evidence or circumstantial evidence, but simply requires that you find the facts based on all the evidence presented, both direct and circumstantial.

Case 2:22-cv-00460-JRG   Document 373   Filed 03/11/25   Page 10 of 101 PageID #: 19123

1032

Now, during the course of the trial, you may have been shown documents with some portions of those documents redacted. In those situations, you should not speculate about what may have been redacted or why it was redacted. Those redactions were approved and ordered by the Court prior to when the trial began.

Also, certain testimony in this case has been presented to you through depositions. A deposition is the sworn recorded answers to questions asked of a witness in advance of a trial. If the witness can't be here to testify in person from the witness stand, then the witness' testimony may be presented under oath in the form of a deposition.

Before the trial began, the attorneys representing the parties in this case questioned these deposition witnesses under oath. At that time, a court reporter was present and recorded their sworn testimony.

This deposition testimony, ladies and gentlemen, is entitled to the same consideration by you as any testimony given by a witness in person from the witness stand in open court, and you must, accordingly, judge the credibility and the importance of deposition testimony to the best of your ability just as if the witness had testified in person in open court.

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences

Federal Official Court Reporter

from the testimony and the exhibits as you feel are justified in the light of common experience.  Said another way, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in this case.  However, ladies and gentlemen, you should not base your decisions on any evidence not presented by the parties during the trial of this case.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary if, after considering all that evidence, you believe that single witness.

When knowledge of a technical subject might be helpful to you, the jury, a person who has special training and experience in that technical field--called an expert witness--is permitted to state his or her opinions on those technical matters.  However, ladies and gentlemen, you're not required to accept the opinions of any expert witness or any witness for that matter.  It is solely up to you to decide whether or not to rely upon the testimony that's been presented during this trial.

Now, certain exhibits have been shown to you over the course of the trial that were illustrations.  We call these types of exhibits demonstrative exhibits, or simply

demonstratives for short.  These demonstrative exhibits are a party's depiction or picture or drawing or model to describe something involved in the trial.

If your recollection of the evidence differs from the demonstratives, you should rely on your own recollection.  These demonstrative exhibits are sometimes called jury aids, and they themselves are not evidence in this case, but a witness' testimony concerning a demonstrative is evidence.  These demonstrative exhibits, ladies and gentlemen, will not be available for you to review during your deliberations.

Also, in any legal action, the facts must be proven by a required amount of evidence, and this is known as the burden of proof.  The burden of proof in this case is on the Plaintiff for some issues and on the Defendant for other issues.  There are two burdens of proof that you will apply in this case.  As we've already discussed, they are the preponderance of the evidence and clear and convincing evidence.

Now, the Plaintiff in this case, Force MOS Technology Company, LTD., which you've heard referred to throughout the trial either simply as the Plaintiff or as Force MOS, has the burden of proving the ownership of United States Patent No. 7,812,409, referred to throughout the trial as the '409 Patent, and they have the burden to prove this by a preponderance of the evidence.

1035

Force MOS also has the burden of proving patent infringement by a preponderance of the evidence. Additionally, Force MOS, the Plaintiff, has the burden of proving willful patent infringement by a preponderance of the evidence.  And Force MOS has the burden of proving damages for any patent infringement by a preponderance of the evidence.

A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true.  As we've noted, this is sometimes talked about as being the greater weight and degree of credible testimony.

Now, the Defendant in this case, ASUSTek Computer, Inc., which you've heard referred to throughout the trial either simply as the Defendant or as ASUSTek, has the burden of proving invalidity of claim 1 of the '409 Patent by clear and convincing evidence.

Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the party's factual contentions are highly probable.  Proof to an absolute certainty is not required, but the clear and convincing evidence standard does require a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard.  If proof establishes in your mind an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

Now, as I've previously told you, ladies and gentlemen,

1036

these two burdens of proof are not to be confused in any way with a separate and different altogether burden of proof known as beyond a reasonable doubt, which is a burden of proof applied in a criminal case and has no application in a civil case such as this.  Beyond a reasonable doubt is a higher standard or burden than both the preponderance of the evidence and clear and convincing evidence.

Now, as I did at the beginning of the case, I'm going to first give you a summary of each side's contentions in this case, and then I'll provide you with detailed instructions on what each side must prove to win on each of its contentions.

As I've told you, this is an action for patent infringement, and Force MOS contends that ASUSTek infringes certain claims of the two patents-in-suit.  Remember, these two patents-in-suit are the '409 Patent, as I've already described for you, together with U.S. Patent No. 7,629,634, which you've heard referred to throughout the trial as the '634 Patent.

ASUSTek contends -- excuse me.  Force MOS contends that ASUSTek infringes the following claims of the patents-in-suit: Claim 1 of the '409 Patent and claims 1, 2, and 3 of the '634 Patent.  Force MOS contends that ASUSTek has infringed the asserted claims by making, using, selling, importing, or offering for sale ASUSTek products incorporating certain MOSFETs with trenched source contacts.  I'll refer to these as

the accused products.

Force MOS further contends that ASUSTek's infringement of the asserted claims has been willful.  And Force MOS contends that it is entitled to money damages in the form of a reasonable royalty for this alleged infringement by ASUSTek.  Force MOS has the burden of proving these issues by a preponderance of the evidence.

Now, ASUSTek denies that it infringes any of the asserted claims from the two patents-in-suit.  ASUSTek denies that it makes, uses, offers for sale, sells, or imports any accused product that infringes any of the asserted claims.  ASUSTek also denies that any alleged infringement was willful.  ASUSTek further denies that it owes Force MOS any money damages.  ASUSTek denies that Force MOS properly acquired and therefore Force MOS does not own the '409 Patent.

ASUSTek also asserts that claim 1 of the '409 Patent is invalid as being anticipated and/or as being obvious.  ASUSTek has the burden of proof of proving invalidity by clear and convincing evidence.

Ownership, invalidity, and infringement are separate and distinct issues, and your job, ladies and gentlemen, is to decide whether ASUSTek has infringed the asserted claims and whether claim 1 of the '409 Patent is invalid.  If you decide that any asserted claim has been infringed and is not invalid, you then will need to decide the amount of money damages, if

any, to be awarded to Force MOS to compensate it for that infringement that you have found.

If you decide that there was any infringement and that that infringement was willful, that decision on willfulness should not affect the damages that you might award.  The Court will take willfulness into account later if you find it.

You're also being asked to determine whether Force MOS properly acquired the '409 Patent.  If you determine that Force MOS has not properly acquired the '409 Patent, you will not need to determine whether Force MOS has infringed [sic] and whether claim 1 of the '409 Patent is invalid, or whether Force MOS should be awarded damages.  None of those questions will be relevant if you determine that Force MOS did not properly acquire the '409 Patent.

Now, before you can decide many of the issues in this case, you will need to understand the role of the patent claims.  The patent claims are those numbered sentences at the end of each patent, and I remind you you have a complete copy of each of the two patents-in-suit in your juror notebooks, and at the end of those patents-in-suit you will see the numbered claims.

These claims are important because it is the words of the claims, ladies and gentlemen, that define what a patent covers.  Now, the figures and the text in the rest of the patent provides a description and/or an example of the

invention and it provides -- they provide a context for the claims.  But it is the claims themselves that define the breadth of the patent's coverage.  Each claim is effectively treated as if it were a separate patent, and each claim may cover more or may cover less than another claim.  As a result, what a patent covers depends in turn upon what each of its claims covers.

And you'll first need to understand what each claim covers in order to decide whether or not there was infringement of that claim and to decide whether or not that claim in the case of the '409 Patent is invalid.

Now, the law says it's my role to define the terms of the claims and it's your role to apply my definitions to the issues that you are asked to decide in this case.  As a result and as I explained to you at the beginning of the case, I have already determined the meaning of certain claim language and I've provided those definitions or constructions to you in your juror notebooks.

And you must accept and apply my definitions of these words from the claims as being correct.  It's your job to take these definitions and apply them to the issues that you are asked to decide, including the issues of infringement and invalidity.

Now, you should disregard any evidence presented during the trial that contradicts or is inconsistent with these

1040

constructions or definitions that I have given you.  For claim limitations or claim language, ladies and gentlemen, that I have not interpreted or construed, you are to use and apply the plain and ordinary meaning of that limitation or those limitations as understood by a person of ordinary skill in the art, which is to say, in the field of the technology of the patent at the time of the alleged invention.

The meaning of the words of the patent claims must be the same when deciding both infringement and invalidity.  And as I've told you, you have complete copies of these patents and the claims in your notebooks.

Now, several times during these instructions I have and I will refer to a person of ordinary skill in the field of the invention, or a person of ordinary skill in the art.  In deciding the level of ordinary skill in the field, you should consider all the evidence introduced at trial, including but not limited to, the levels of education and experience of the inventor and other persons actively working in the field; the types of problems encountered in the field; the previous solutions to those problems; the rapidity with which innovations are made; and the sophistication of the technology.

A person of ordinary skill in the art is a hypothetical person who is presumed to have known all the relevant prior art at the time of the claimed invention.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1041

Now, the claims are intended to define in words the boundaries of the inventor's rights.  Only the claims of a patent can be infringed, ladies and gentlemen.  Neither the written description nor any of the drawings or anything else in the patent except the claims can be infringed, and each of the claims must be considered individually.

I'll now explain how a claim covers -- excuse me -- how a claim defines what it covers.

A claim sets forth in words a set of requirements.  Each claim sets forth its requirements in a single sentence.  If a product satisfies each of these requirements, then it is covered by that claim.  And there can be several claims in a patent, and each claim may be narrower or may be broader than another claim by setting out more or fewer requirements.

And the coverage of a patent is assessed and determined on a claim-by-claim basis.  In patent law the requirements of a claim are also often referred to as the claim elements or as the claim limitations.  And when a product meets all of these requirements of a claim, the claim is said to cover that product, and that product is said to fall within the scope of that claim.

In other words, a claim covers a product where each of the claim elements or limitations are present in that product.  If a product is missing even one element or limitation of a claim, the product is not covered by the claim.  And if the

1042

product is not covered by the claim, the product cannot infringe that claim.

Now, the beginning portion, or the preamble, of a claim often uses the word 'comprising'.  As we've discussed, the word 'comprising' when used in the preamble means including but not limited to, or containing but not limited to.  And when comprising is used in the preamble, if you decide that an accused product includes all the requirements of the claim, that claim is infringed.  And that is true even if the accused product contains additional elements.

For example, a claim to a table comprising a tabletop, legs, and glue, would be infringed by any table that includes a tabletop, legs, and glue, even if that table contains other structures, such as leaves that would expand the size of the tabletop or wheels that might go on the end of the legs.

Now, this case involves two types of patent claims: independent claims and dependent claims.  In this case, claim 1 of the '409 Patent and claim 1 of the '634 Patent are independent claims.  Claims 2 and 3 of the '634 Patent are dependent claims.

An independent claim sets forth all of the requirements that must be met in order to be covered by that claim.  It is not necessary to look at any other claim within the patent to determine what an independent claim covers.

On the other hand, a dependent claim does not itself

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

recite all the requirements of the claim, but refers to another claim for some of its requirements.  In this way, the claim depends on or from another claim.  A dependent claim incorporates all the requirements of the claim to which it refers, or from which it depends, as well as its own additional requirements.  So to determine what a dependent claim covers, ladies and gentlemen, it's necessary to look at both the dependent claim and any other claim to which it refers.  Now, a product that meets all the requirements of both the dependent claim and the claim to which that dependent claim refers is covered by that dependent claim.

Also, if a person or corporation makes, uses, sells, or offers for sale within the United States, or imports into the United States, what is covered by a patent claim without the patent holder's permission, that person or corporation is said to infringe the patent.

In reaching your decision on infringement, keep in mind, ladies and gentlemen, that only the claims of a patent can be infringed, and you must compare the asserted claims, as I may have construed or interpreted them for you, to each of the accused products to determine whether or not there is infringement.  This is the only correct comparison.  The comparison between the language of the asserted claims and the accused products.

You should not compare the accused products with any

specific examples set out in the patent or in the prior art in reaching your decision on infringement. The only correct comparison is between the accused products and the limitations or elements of the claims as the Court might have construed or interpreted them. And you must reach your decision on each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by both of the competing parties during the trial.

I'm now going to instruct you on the specific rules that you must follow to determine whether the Plaintiff Force MOS has proven that the defendant ASUSTek has directly infringed one or more of the asserted claims involved in this case.

A patent can be directly infringed even if the alleged direct infringer did not have knowledge of the patent and without the direct infringer knowing that what it did was infringement of the claim.

A patent may also be directly infringed even though the accused direct infringer believed in good faith that what it did was not infringement of the patent. Infringement does not require proof that a party copied its product from the asserted claims.

You must determine separately for each claim whether or not there is infringement. However, if you find that an independent claim on which other claims depend is not

1045

infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to that independent claim.

On the other hand, if you find that an independent claim has been infringed, you must still decide separately whether the accused product meets the additional requirements of any claim that may depend from that independent claim, that is, whether those claims have also been infringed.  A dependent claim includes all the requirements of any of the claims to which it refers plus the additional requirements of the dependent claim itself.

Now, in order to prove infringement of a patent claim, Force MOS must show by a preponderance of the evidence that the accused products literally include each and every limitation of the claim.

In determining whether the accused products directly infringe a patent claim in this case, you must compare the accused products with each and every one of the requirements or limitations of the claim to determine whether the accused product contains each and every requirement or limitation recited within the claim.  An accused product infringes a claim if it is reasonably capable of satisfying the claim elements.

A claim requirement is literally present if it exists in the accused products just as it is described in the claim language, either as I have explained that language to you, or

if I did not explain it, as it would be understood by its plain and ordinary meaning to one of ordinary skill in the art. If the accused product, however, omits any element recited in the claim, then you must find the products in question do not literally infringe that claim.

So long as the accused products have each and every one of the claim requirements, infringement of that claim is shown, even if the products contain additional elements or features not required by the claims.

I'll now instruct you on indirect infringement. In this case Force MOS has accused ASUSTek of indirect infringement by actively inducing ASUS Computer International, also referred to as ACI, as well as the users of the accused products to directly infringe the asserted claims of the asserted patents. As with direct infringement, you must determine whether there has been inducement or induced infringement on a claim-by-claim basis.

ASUSTek is liable for induced infringement of a claim only if Force MOS proves by a preponderance of the evidence that:

1. Acts have been carried out by ACI or the users of the accused products that directly infringe that claim;

2. ASUSTek has taken action during the life of the asserted patents intending to cause the infringing acts by ACI and the users of the accused products; and

3.  ASUSTek has been aware of the asserted patents and has known that the acts of ACI and the users of the accused products constitute infringement of the asserted patents, or has been willfully blind to that infringement.

Willful blindness is established if ASUSTek believed there was a high probability that the acts, if taken, would constitute infringement of the asserted claims, but deliberately avoided confirming that belief.

Now, to establish induced infringement, it is not sufficient that someone else directly infringes a claim, nor is it sufficient that the company accused of inducing another's direct infringement merely had knowledge or notice of an asserted patent or had been aware of the acts by another that allegedly constitute direct infringement.

Also, the mere fact that the company accused of inducing another's direct infringement had known or should have known that there was a substantial risk that someone else's acts would infringe is not sufficient.  Rather, in order to find inducement, you must find that ASUSTek specifically intended or was willfully blind to that infringement.

Force MOS also contends that ASUSTek has willfully infringed the patents-in-suit.  If you decide that ASUSTek has infringed, then you must go on to address the issue of whether or not that infringement was willful.  Force MOS has the burden of proving willful infringement by a preponderance of

the evidence.

You may not determine that infringement was willful just because ASUSTek knew of the asserted patents and infringed them. However, you may find that ASUSTek willfully infringed if you find that ASUSTek deliberately or intentionally infringed the asserted patents.

You may find that ASUSTek's actions were willful if ASUSTek acted in reckless or callous disregard of, or with indifference to, the rights of Force MOS. A defendant is indifferent to the rights of another when it proceeds in disregard of a high or excessive danger of infringement that is known to it or that was apparent to a reasonable person in its position.

Now, to determine whether ASUSTek acted willfully, consider all the facts and assess ASUSTek's knowledge at the time of the alleged conduct. Facts that may be considered include whether or not ASUSTek reasonably believed that it did not infringe or that the asserted patents were invalid.

Your determination of willfulness, ladies and gentlemen, should incorporate the totality of the circumstances based on the evidence presented during this trial. Willfulness can be established by circumstantial evidence. And if you decide that infringement was willful, that decision should not affect any damages that you might award. As I've told you, I will take willfulness into account later if you find it.

1049

I'll now instruct you about the rules you must follow in deciding whether or not ASUSTek has proven that claim 1 of the '409 Patent is invalid.  An issued United States patent is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office acted correctly during the issuance of the patent.  This presumption of validity extends to all issued United States patents.

And in order to overcome this presumption, ASUSTek must establish by clear and convincing evidence that a claim is invalid.  Like infringement, invalidity is determined on a claim-by-claim basis, and you must determine separately for claim 1 of the '409 Patent whether that claim is invalid.

Now, claims are construed in the same way for determining infringement as for determining invalidity, and you must apply the claim language consistently and in the same manner for the issues of infringement as for the issues of invalidity.  And in making your determination as to invalidity, you must consider each claim separately.

Now, the parties in this case do not dispute the validity of the '634 Patent.

As I've explained earlier, ladies and gentlemen, a previous device, system, method, publication, or patent that predates the claimed invention is generally called prior art and may include items that were publicly known or that have been used or offered for sale, or references, such as

1050

publications or patents, that disclose the claimed invention or elements of the claimed invention.

To be prior art, the item or reference must have been known or used in the United States, or filed as a patent application or published in the United States or a foreign country before the priority date of the patent.  And the parties in this case agree that the priority date for the '634 Patent is February the 23rd, 2008, and the priority date for the '409 Patent is December the 4th, 2006.

Now, prior art may be authored or created by anyone.  In evaluating the prior art to determine whether an invalidity defense has been proven by clear and convincing evidence, you must consider whether that prior art was or was not -- you may consider whether that prior art was or was not before the Patent and Trademark Office, which you've heard referred throughout the case simply as the PTO, or as the Patent Office.

I'm now going to instruct you on how to determine whether claim 1 of the '409 Patent is invalid as being anticipated by U.S. Patent No. 6,888,196, which you've heard referred to throughout the trial as Kobayashi.  In order for someone to be entitled to a patent, the invention must actually be new, and the inventor must not have lost his or her rights by delaying the filing of an application claiming the invention.  In general, ladies and gentlemen, inventions are new when the

identical product has not been used or disclosed before.

ASUSTek contends that claim 1 of the '409 Patent is invalid because its claimed invention is not new.  In other words, ASUSTek contends that the claim is anticipated by the prior art.  Anticipation requires that all of the requirements of a patent claim be disclosed in a single prior art reference.

Also, a single prior art reference must disclose all elements of the claim arranged or combined in the same way as in the claim, and as the claim has been construed or interpreted by the Court.  ASUSTek must prove by clear and convincing evidence that an asserted patent claim was anticipated by the prior art reference.  Anticipation must be determined on a claim-by-claim basis.

To anticipate the invention, the prior art does not have to use the same words as the claim, but all the requirements of the claim must have been disclosed, either stated expressly or implied, to a person of ordinary skill in the art in the technology of the invention, so that looking at that one reference, that person could make and use the claimed invention.

Keep in mind that ASUSTek may not establish anticipation by arguing that the accused products practice the prior art, or by comparing the accused products to a prior art reference. An item of prior art may anticipate without explicitly

disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference.

Separately, ASUSTek contends that claim 1 of the '409 Patent is obvious in light of Kobayashi in combination with U.S. Patent No. 5,763,914, which you've heard of as Hshieh. And it's pronounced Hshieh, but it's spelled H-S-H-I-E-H.  And I'll now instruct you on how to determine whether claim 1 of the '409 Patent is invalid as being obvious.

Even though an invention may not have been identically disclosed or identically described in a single prior art reference before it was made by an inventor, in order to be patentable the invention must also not have been obvious to a person of ordinary skill in the field of the technology of the patent at the time the invention was made.

ASUSTek has the burden of establishing obviousness by showing by clear and convincing evidence that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made and in the field of the technology of the patent.

Now, in determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field that someone would have had at the time the invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention.

Keep in mind, ladies and gentlemen, that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness.  Most, if not all, inventions rely on the building blocks of prior art.  The skill of the actual inventor is not necessarily relevant because inventors may possess something that distinguishes them from persons having ordinary skill in the art.

Now, in considering whether the claimed invention was obvious, you must first determine the scope and content of the prior art.  The scope and content of the prior art for deciding whether the invention was obvious includes at least prior art in the same field as the claimed invention.  It also includes prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that is addressed by the invention.

Further, teachings, suggestions, and motivations may be found within the knowledge of a person of ordinary skill in the art, including inferences and creative steps that a person of ordinary skill in the art would employ.  A person of ordinary skill in the art may be able to fit the teachings of multiple pieces of prior art together like pieces of a puzzle.  The person of ordinary skill in the art would have the capacity of understanding the scientific and engineering principles applicable to the pertinent art.

In considering whether a claimed invention is obvious,

1054

you may, but you are not required, to find obviousness if you find that at the time of the claimed invention there was a reason that would have prompted a person having ordinary skill in the field to combine the known elements in a way that the claimed invention does, taking into account such factors as:

1.  Whether the claimed invention was merely the predictable result of using prior art elements according to their known function;

2.  Whether the claimed invention provides an obvious solution to a known problem in the relevant field;

3.  Whether the prior art teaches or suggests the desirability of combining elements in the claimed invention;

4.  Whether the prior art teaches away from combining elements in the claimed invention;

5.  Whether it would have been obvious to try the combination of elements in the claimed invention, such as when there is a design need or market pressure to solve a problem, and there are a finite number of identified, predictable solutions; and

6.  Whether the change resulted more from design incentives or other market forces.

To find the invention obvious, you must find that the prior art provided a person having ordinary skill in the field a reasonable expectation of success.  Obvious to try is not sufficient in unpredictable technologies.

Now, in determining whether the claimed invention was obvious, consider each claim separately, and do not use hindsight; consider only what was known at the time of the invention.  In other words, you should not consider what a person of ordinary skill in the art would know now or what has been learned from the teachings of the '409 Patent.

In making these determinations, a person of ordinary skill uses simple common sense and can rely on the inferences and creative steps that a person of ordinary skill in the art would employ.  Also, ASUSTek does not need to show that one of ordinary skill would actually have combined the physical structures of two references; one need only combine the teachings.

Remember, as stated earlier, prior art is not limited to patents and published materials, but includes the general knowledge that would have been available at the time to one of ordinary skill in the field of the invention.  If you find that ASUSTek has proven the obviousness of a claim by clear and convincing evidence, then you must find that that claim is invalid.

If you find that ASUSTek has infringed a valid claim of the asserted patents, you must then consider what amount of money damages, if any, to award to the plaintiff Force MOS.

I'll now instruct you, ladies and gentlemen, about the measure of damages.  But by instructing you on damages, I am

not suggesting which party should win this case on any issue. Now, if you find that ASUSTek has not infringed any valid claim from the patents-in-suit, then Force MOS is not entitled to any money damages.

Force MOS has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that Force MOS establishes that it more likely than not suffered as a result of ASUSTek's infringement.  While Force MOS is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty.

Force MOS is not entitled to damages that are remote or that are only speculative.  You must use your sound discretion in fixing an award of damages, drawing reasonable inferences where you find them appropriate from the facts and circumstances in evidence.

The damages that you might award, if any, must be adequate to compensate Force MOS for any infringement that you may find.  You must not award Force MOS more damages than are adequate to compensate it for the infringement.  You also must not include an additional amount for the purpose of punishing ASUSTek or for setting an example.

Force MOS seeks damages in the form of a reasonable royalty, and I'll now instruct you on how to calculate reasonable royalty damages.

1057

A royalty, ladies and gentlemen, is a payment made to the patent holder in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the amount of royalty payment that a patent owner and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when infringement first began.

In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations.  In determining this, you must assume that both parties believed that the patent was valid and infringed and that both parties were willing to enter into an agreement.

The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either party would have preferred.  Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.

Although evidence of the actual profits of an alleged infringer -- that an alleged infringer made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer

made.

Now, the law requires that any royalty awarded to Force MOS correspond to the value of the alleged inventions within the accused products, as distinct from other unpatented features of the accused products.  And this is particularly true where the accused products have multiple features and multiple components not covered by the patent or where the accused products work in conjunction with other non-patented items.

If unpatented features contribute to the accused products, you must apportion that value to exclude any value attributable to unpatented features.  You must determine the appropriate royalty rate and the appropriate royalty base that reflect the value attributable to the patented invention alone.

Now, in determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.

Some of the kinds of factors that you may consider in making your determination are:

1.  The royalties received by the patentee for the licensing of the patents-in-suit, proving or tending to prove an established royalty;

2.  The rates paid by the licensee for the use of other patents comparable to the patents-in-suit.  Comparable license

agreements include those covering the use of the claimed invention or similar technology;

3.    The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

4.    The licensor's established policy and marketing program to maintain its patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

5.    The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business;

6.    The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of its non-patented items, and the extent of such derivative or convoyed sales;

7.    The duration of the patent and the term of the license;

8.    The established profitability of the product made under the patents, its commercial success, and its current popularity;

9.    The utility and advantages of the patented property over the old modes or devices, if any, that had been used for

working out similar results;

10.    The nature of the patented invention, the character of its commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention;

11.    The extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

12.    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

13.    The portion of the realizable profits that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

14.    The opinion and testimony of qualified experts; and

15.    The amount that a licensor (such as Force MOS) and a licensee (such as ASUSTek) would have agreed upon (at the time the infringement began) if both had been trying reasonably and voluntarily to reach an agreement; that is, the amount which a prudent licensee--who desired as a business proposition to obtain a license to the patented invention--would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable

1061

to a prudent patentee who was willing to grant a license.

Now, you may have heard these factors referred to, ladies and gentlemen, as the *Georgia-Pacific* factors.  No one of these factors is dispositive, and you can and you should consider the evidence that has been presented to you in this case on each of these factors.

You may also consider any other factors which, in your mind, would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent owner would have been willing to accept, acting as normally prudent business people.

Now, with these instructions, we'll proceed at this time to hear closing arguments from the attorneys for the competing parties.

Mr. Hanba, the Plaintiff may present its first closing argument at this time.

Would you like a warning on your time?

MR. HANBA:  Yes, Your Honor; two minutes, please.  And Plaintiff reserves 17 minutes.

THE COURT:  All right.  You want to reserve 17 minutes and that leaves you 23, and so you want a warning with two minutes remaining before you complete that 23?  So I'll warn you when you've used 21 minutes.  Does that sound right?

MR. HANBA:  Yes, Your Honor.

THE COURT:  All right.  You may proceed with your

closing argument.

MR. HANBA:  May it please the Court.

First, I want to thank you for your service as jurors. We appreciate your time and attention this week, and I'm eager to share Force MOS's closing presentation with you.  So let's start at the beginning which was opening statements last Friday.  Opening statements are like promises and previews, so let's see who kept our promises.

When you deliberate, you'll fill out the verdict forms. I've organized this presentation to match the questions you'll be asked to answer.  First, ownership of the '409 Patent, then infringement, willfulness, validity, and damages.

And as I talk about each of these topics, I'll reference the instructions the Court's given you and you'll apply those to the evidence that you've seen at this trial.

So ASUS has argued that Force MOS doesn't own the '409 Patent.  To hear ASUS tell it, the inventor and one of the founders of Force MOS, Dr. Hshieh, intended to assign the '409 Patent to a company that doesn't exist.

And let's remember what the dispute is here.  Instead of referring to Force MOS Company, LTD., the 2006 assignment signed by Dr. Hshieh inadvertently referred to Force MOS Technology Corporation.

Now, we heard testimony from Mr. Rafael Chung that this simple mistake was nothing more than a matter of translation.

In Chinese there aren't separate words for company and corporation.  Instead there's just one word in Chinese for both of these.  That's what this dispute is about.  There is nothing unusual about this.  In fact, we saw it happen during trial this week.

Remember when Mr. Hung testified on Tuesday that he was employed by ASUSTek Computer International -- Incorporated?  But his testimony was inadvertently translated as ASUSTek Company, Ltd.  You remember His Honor issued an instruction shortly after Mr. Hung's testimony.

Dr. Hshieh intended to assign the '409 Patent to Force MOS Technology Company, Ltd., the company that he cofounded.  In fact, he was obligated to do so under his employment with Force MOS.  And Dr. Hshieh continued to work with Force MOS until 2016 and never once raised an issue regarding the 2006 assignment, all while Force MOS continued to pay all the fees associated with the patent.

Now, ASUS tried to confuse this issue.  And you might remember Mr. Underwood writing on the board or running searches in a Cayman Islands registry for every name.  Every name but the name that Mr. Chung told him the company was actually registered under.

But all of those arguments that ASUS made to you were actually put before the U.S. Patent Office.  Force MOS explained to the Patent Office exactly what it explained to

1064

you-all this week.  It presented to the Patent Office all of the very same evidence.

And what did the Patent Office do?  It considered all of the information Force MOS submitted and issued a notice reflecting that Force MOS, the Plaintiff in this case, is the assignee of the '409 Patent.  Force MOS showed you that notice during trial.  All of the evidence presented in this case was good enough for the Patent Office, but apparently isn't good enough for ASUS.

So when you fill out that verdict form and reach Question 1 you see there, whether Force MOS proved that it acquired all rights in the '409 Patent from Dr. Hshieh, I trust that based on the evidence you'll see why the answer is yes.

You'll also be asked to decide if ASUS products have infringed the claims of the '634 and '409 Patents.  Now, in His Honor's instructions to you, he told you that Force MOS bears the burden and, like we told you on Friday, Force MOS is happy to meet that burden.

In ASUS's opening statement, they asked you to pay attention to the proof.  In fact, counsel said, where's the proof?  He asked it nine times in the last ten minutes.  He said it nine times in the last ten minutes of his opening statement.  So let's take a look at the proof and see if we've met our burden.

I'll start here with the accused products.  Dr. Neikirk

showed you the tear-down images of the accused products taken by Microtech.  Inside the accused products, he identified each of the seven infringing MOSFETs.  The accused MOSFETs are listed here, and we've heard about them all week.  These seven MOSFETs are made by four companies, one of which you heard was controlled by ASUS's directors.

So what proof did Dr. Neikirk show you in addition to the tear-down images?  Well, he showed you seven specification sheets detailing the specifics of each accused MOSFET.  He showed you nine different EDS images that were taken by Microtech.  He told you eight different SEMs.  All of these are admitted evidence.

He showed you the website where anyone can go today and purchase ASUS products here in the United States.  And then he summarized all of his analysis based on all of this admitted evidence and showed you on these marked-up demonstratives.

Now, if you remember, there was some criticism from Dr. Shanfield that the marked-up image that Dr. Neikirk used to help point things out to you covered up the original images.  But, remember, we showed you those original images.  In fact, those very same images are on the screen right now.

Dr. Neikirk also showed you a couple of animations, and he shared his estimates for the MOSFET counts.  So where's the proof, ladies and gentlemen?  It's here.  It's everything I just showed you, along with over three very long hours of

testimony by Dr. Neikirk.  We took our burden of proof seriously and that's why we took over three hours to walk you through all of the evidence that I just shared with you.

We also heard from ASUS, as you listen to the testimony today and next week, I encourage you to keep an eye on that lateral contact layer and ask yourself, where is the proof?

If you recall, this lateral contact layer relates to the '634 Patent, element 1[g].  Well, Dr. Neikirk discussed the Court's claim constructions and how he applied those.  Then he showed PX 27.2, among others, and identified where the sidewalls are in the image.  He then showed you this ion implantation animation showing you exactly how the lateral contact layer is formed identifying both the P+ based contact layer and P* areas on the lateral contact layer.

And you know what else he testified?  Dr. Neikirk testified about the supplier documents provided to shared with all of us related to that lateral contact layer of element 1[g].  All of this evidence combined shows that all of the claim elements for the '634 Patent were met by each and every one of those MOSFETs, which are contained in all of the accused ASUS products.  That's true for the '634 Patent I'm showing you here.

And he also went through each and every element of the '409 Patent for those MOSFETs in claim 1.  Here's PX 30.  We see substantially square-shaped cells with rounded corners.

The cells are uniform; the SEM is clean.  Everyone can see that.  Everyone but Dr. Shanfield.

Dr. Shanfield claims that because the process, quote, tore the device to pieces because it was a hot acid treatment that attacks the layers.  Do those uniform cells look like they've been torn to pieces?  Dr. Shanfield kept trying.  He wasn't -- kept saying he wasn't trying to attack Mr. Diep, but that's exactly what he attempted to do.

But Mr. Diep has 24 years of experience preparing samples, doing just this, working with different clients and working on hundreds of SEMs.  Mr. Diep stands by the work he did in this case, and he testified that his work was consistent with the work he's done for his other clients.  In fact, Mr. Diep testified that the photographs were accurate and ASUS products -- of the ASUS products and provided a correctly cleaned and accurate SEM image of the MOSFETs.

Dr. Shanfield and ASUS kept suggesting that the SEM images were all spoiled, that these were too heavily etched.  But Mr. Diep says the exact opposite.  He notes that final polish allows you to get back to a clean surface.

The steps Mr. Diep took were common practice and normal flow of preparing these SEMs.  This is his job.  Mr. Diep performed his work properly, resulting in great SEM images which Dr. Neikirk said were consistent with the thousands of SEM images he's seen over his 40-year career.

1068

Ladies and gentlemen, the '409 Patent is clearly infringed.

Now, what did ASUS provide us for evidence? Dr. Shanfield showed us a styrofoam cup, and he told you it wouldn't get wet on the sides if it rained.

If we combined the testimony from ASUS's expert, Dr. Shanfield; ASUS's corporate representatives, Mr. Fu and Mr. Hung; and Panjit's supplier witness, Mr. Chung, and we put all of that evidence together, this is what we heard: Force MOS sent a notice letter to ASUS. ASUS wonders, do we infringe?

Then you heard testimony that ASUS reached out to Panjit and to its other suppliers. We heard that Panjit is the one who has to pay for this lawsuit. So, unsurprisingly, they told ASUS that their MOSFETs don't infringe. They took SEM images, sent those SEM images along with other documentations to Dr. Shanfield and ASUS, and even had conversations with Dr. Shanfield and ASUS.

And what did we learn that ASUS and its expert, Dr. Shanfield, did in response? Well, did they show these SEMs to Force MOS? No. Did ASUS show these SEMs to you? No. Did ASUS have Dr. Shanfield take SEMs and show you? No.

Instead, ASUS just said, just don't tell them we don't infringe [sic]. Excuse me. ASUS said, just tell them we don't infringe. ASUS said, criticize Mr. Diep's work, say

that those SEM images are bad.  That's all that ASUS did in response to its infringement claims.

Incredibly, ASUS would like you to believe that they don't sell or even offer to sell their products in the United States.  But, again, let's look at the evidence.  We called Mr. Fu adversely in our case to make sure that you would see and hear the evidence.  Mr. Fu told us that the whole process of the asus.com/us website is to generate sales in the U.S. of ASUSTek's product.

And what else did we learn about the ASUS website?  Well, we know that ASUS itself is the registered owner of the website.  We also know that ASUS's products, including the ROG Strix 270 motherboard, which is a representative product in this case, is available for sale on the website.  And we know that because ASUS sells its products in the United States, it has registered trademarks to protect its products with that ASUS logo.

So where is the proof?  Well, you just saw it again.  It all came directly from ASUS's own witnesses and documents.  And we made sure to bring that evidence to you this week.

Mr. Fu also told us that ASUS knows that ASUS Computer International, or ACI, is going to import ASUS's products into the United States when they're purchased on ASUS's website.

Why does that matter?  Well, the Court instructed you that ASUS is liable for induced infringement.  If we prove

1070

that acts have been carried out by ACI, they directly infringe.  ASUS took action intending to cause an infringing act by ACI, and ASUS knew of the infringement or was willfully blind to it.

Mr. Fu confirmed that ACI is importing the accused products into the United States, and ASUS knows and absolutely intended for it to happen.  In fact, ASUS's own lawyers showed you importation records as additional proof that ACI imports the accused products into the U.S.

Ladies and gentlemen, here are the jury instructions as to Force MOS's burden to show infringement by a preponderance of the evidence.  A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not.  More probably true than not.  So let's compare the evidence and see where the scales tip.

Here is all the evidence we showed you, and we have on the other side is ASUS's criticism.  Remember Lady Justice? Her scales of justice clearly lean in our favor.

So when you fill out that verdict form and reach Questions 2A and 2B, whether Force MOS has proven that ASUS infringes claims 1 through 3 of the '634 Patent and claim 1 of the '409 Patent, I trust that, based on the evidence, you'll see that the answers are yes.

The evidence also showed us that even after Force MOS sent ASUSTek detailed images showing how the ASUS products

were infringing the '409 Patent and the '634 Patent, that ASUS did nothing. Remember we saw this earlier. Did ASUS show the SEMs to Force MOS? No. Did ASUS show the SEMs to you, the jury? No. Did ASUS have Dr. Shanfield take SEMs and show you, the jury? No. ASUS said, Just tell them we don't infringe. ASUS said, Criticize Mr. Diep's work; those are bad SEM images. Just criticize Dr. Neikirk's work. That's what they said.

Mr. Fu also told us that Force MOS sent letters detailing infringement to ASUS -- that after Force MOS's letters, ASUS didn't test any MOSFET from Panjit, didn't create or even have a third party create any SEM images of accused products, and didn't do any analysis of the accused products.

Ask yourself: Why would a party accused of patent infringement not do any analysis of the accused products? Well, Mr. Fu's excuse was that ASUS, one of the largest computer companies in the world, doesn't know how to do that. You heard that ASUS, after receiving notice of the infringement, never changed what it was doing. ASUS is deliberately and willfully infringing.

So when you fill out that verdict form and reach Question 4, whether Force MOS has proven ASUS's willful -- excuse me, ASUS's infringement is willful, I trust that, based on the evidence, you'll see why the answer is yes.

So let's talk about validity. An issued United States

1072

patent is presumed valid based on the presumption that the PTO acted correctly in issuing the patent.  And this presumption of validity extends to all issued U.S. patents, all of them.

As you heard from His Honor's instructions, to meet their burden of proof, ASUS must show by clear and convincing evidence, meaning ASUS's proof must establish an abiding conviction, abiding conviction, in the truth of the matter.  So let's start with ASUS's anticipation position.

ASUS says Kobayashi anticipates claim 1 of the '409 Patent, meaning that every single element in the claim is found in a single one reference.  But let's look at what the evidence actually shows.  Dr. Shanfield admitted, he admitted, that the figures in Kobayashi don't show square-shaped cells with rounded corners.

And what did he do next?  Well, he showed you this figure and pointed to what he said were rounded corners.  But what he didn't tell you was that this was talking about a completely different part of the MOSFET--the gate.  It was talking about the gate, not the cell as required by the claim.  A gate is a completely different structure than the square-shaped cells with rounded corners as claimed in the '409 Patent.  It's apples to oranges.

And Dr. Shanfield knows this, which is why he had that back-up position or that's the obviousness position.  But, again, where is their proof?  ASUS had to show you clear and

convincing evidence that a person of ordinary skill would have combined Kobayashi and Hshieh.  Dr. Shanfield provided absolutely no motivation to combine.  ASUS had to provide a real reason.  ASUS can't use hindsight to piecemeal two unrelated random documents.

So not only has ASUS failed to provide a motivation to combine, but as Dr. Neikirk explained, the prior art actually teaches away just like that example that you wouldn't put an engine from a Volkswagen into a pickup truck.  But these references don't belong together.  The Hshieh patent does not use squares.  In fact, the entire point of the Hshieh patent is to avoid using squares.  Dr. Shanfield is not only not obvious; the evidence tells you not to do this.

So where does that leave us?  ASUS bears the burden to prove invalidity by clear and convincing evidence.

THE COURT:  21 minutes have been used.

MR. HANBA:  And what they actually show, well, a combination of documents that teach you not to combine the features.  A reference that doesn't disclose all the claim limitations.  This is not clear and convincing evidence.  This is not an abiding conviction.  That's not even close.

So when you fill out that verdict form and reach Question 3 on invalidity, whether ASUS has proven by clear and convincing evidence that claim 1 of the '409 Patent is invalid, I trust that based on the evidence you'll see why the

answer is no.

Thank you.

ASUS gets to present their closing argument now.  I look forward to talking to you again when they're done.

THE COURT:  All right.  Defendant may present its closing argument at this time.

Mr. Underwood, would you like a warning on your time?

MR. UNDERWOOD:  Yes, Your Honor.  May I have warnings at -- when I've used 15 minutes and when I've used 20 minutes.

THE COURT:  You may.  I'll give you those warnings.

MR. UNDERWOOD:  Thank you, Your Honor.

THE COURT:  Let's proceed with Defendant's closing argument when you're ready.

MR. UNDERWOOD:  Thank you.  May it please the Court, counsel.

Ladies and gentlemen, the very first I would like to do is thank each and every one of you for your service.  I know it's been a long week, beginning last Friday.  I know we've had long days.  I know you've been away from your responsibilities, from your jobs, from your families.  I know now you've had to drive through the rain to get here.  You've had to stay late.  And so I want to thank you very much for your service, because this is a very important case.

It's a case that at its surface is about patents.  The

1075

Court has instructed you about patents, and the questions you're going to answer are about patents.  But at its core this case is about more than patents.  This is a case about responsibility.  This is a case about acting responsibly, even when things don't go your way.

As I explained to you in the jury selection process, my client ASUSTek believes it has been wrongfully accused, and we need your help, ladies and gentlemen.

Now, I have a limited amount of time to discuss the evidence with you.  I'm then going to sit down, and Mr. McMahon is going to stand up and discuss the remaining evidence in the context of the questions that you-all will have to answer.  But for now I want to go back to where our story begins, where this case begins.

Recall, you heard evidence about the way that ASUSTek does business.  ASUSTek designs computers.  ASUSTek doesn't manufacture them, and it doesn't manufacture or design all the individual parts that go inside, including the MOSFETs.  So ASUSTek and its manufacturers have to buy those from suppliers, and ASUSTek does lawfully buy those from suppliers.  And you saw the evidence.

Over the years there were a number of suppliers that ASUSTek used, and in 2017 ASUSTek added another supplier to that list.  That supplier was the Plaintiff, Force MOS.  Now, with that supply relationship came added responsibility for

Force MOS, because you heard from Mr. Fu, ASUSTek's corporate representative, about how ASUSTek only uses qualified components in its products.  That's to ensure that they're up to the highest standard.

Let's go to the purchase and sale agreement.  This was the document that was signed in 2017 by both of the parties, and it in its very terms required the Plaintiff Force MOS to bear the responsibility for guaranteeing any defects of the materials that it sold to ASUSTek.  And it also set forth requirements about what types of materials would be used in the products that it sold ASUSTek.

And, importantly, it could not change what it put into the products without ASUSTek's consent, without giving notice to ASUSTek.  These were the rules that the Plaintiff agreed to follow.

Well, what was the evidence you heard and the evidence that you saw?  For a series of years ASUSTek purchased MOSFETs, millions of MOSFETs, from the Plaintiff.  And then in 2021 -- and they also purchased BJT, or transistors.

And then in 2021, ASUSTek started receiving complaints, and they traced those complaints--this is DX 7--they traced those complaints to Force MOS.  And they brought those complaints to Force MOS's attention.  They raised their hand. They didn't lay behind the log; they were upfront.  They identified this problem to Force MOS.

What was the evidence you heard from Mr. Fu?  How did Force MOS respond?  Force MOS claimed that they ran tests on the products and found no defects.  Well, what did that cause ASUSTek to do?  ASUSTek knew that there were complaints, they knew that there were problems, and they traced them to Force MOS.

So ASUSTek ran its own tests, and what did they discover?  This was the testimony of Mr. Fu.  ASUSTek opened the components that Force MOS sold and found out that they were using components that Force MOS was not supposed to sell them.  Recall, we just saw the purchase and sale agreement.  There were certain requirements about the components that were going to be used that had to be used.  Those were the rules.  And the rules required Force MOS to provide notice and give ASUSTek an opportunity to weigh in if they were going change anything.  They didn't.

So what was ASUSTek's reaction?  Well, they were disappointed.  Force MOS never told ASUSTek about this.  And it was a surprise to ASUSTek.  But you know what?  It wasn't a surprise to Force MOS.  Force MOS knew that they were making changes to the products, changes that ended up causing defects, changes that ended up causing customer complaints.

Of course, then that resulted in the quality assurance agreement several months down the road from the discovery of the defects.  And in this quality assurance agreement, Force

MOS agreed to pay money, to bear the responsibility.

Now, the Plaintiff points to this and says two things about it. The first thing that they say is that, well, this agreement had nothing to do with MOSFETs. They point to the METR3904 component, and they say, well, that was a transistor; it wasn't about MOSFETs.

Well, that may be true, but whose transistor was it? You recall I got the opportunity to ask questions of the corporate representative, Mr. Chung. I asked him, it's your product. Correct, sir? Yes. And he even agreed with me that it was a problem. It was a problem. So the fact that it had nothing to do with MOSFETs is irrelevant.

Now, here is the other issue. The problem was deeper than whether it was MOSFETs or whether it was transistors or whether it was something else. The problem, according to the ASUSTek corporate representative, Mr. Max Fu, was that Force MOS was not honest, and that's why the quality assurance agreement didn't resolve the issue in ASUSTek's mind. Mr. Fu testified, it did not resolve the issue.

Well, why didn't it resolve the issue? Too little too late. They only signed this agreement after ASUSTek had to be the party to bring this to their attention, to do their own tests, and to point out the flaws. Force MOS was not upfront about it. That was the problem, ladies and gentlemen.

Well, what happens next? You saw the timeline. And in

1079

May of 2022, Force MOS began accusing ASUSTek of infringement right here.  Now, there's three problems with this, three major problems with it, and the first is the timing, the timing, when this came.

Let's look right here in the top left-hand corner.  When did the patents issue?  The patents issued in 2009 and 2010.  They weren't new.  Well, when did ASUSTek and Force MOS begin their relationship?  2017.  And they had several productive years--from 2017 up through 2021 with a productive business relationship.  And by the way, during that time Force MOS knew that ASUSTek was also buying components from other suppliers like Panjit.

How do we know that they knew that?  Because Mr. Chung testified to it.  This is what I asked him, You also understand, don't you, that ASUSTek has to purchase components like MOSFETs from other suppliers.  Right?

Yes.

Those include companies like Panjit.

Yes.

So we've been in business for years.  They knew what was going on.  These patents were old.  What changed?  There was only one thing that changed.  We discovered that they were selling defective products, that they were not upfront with us about it, and we made the decision to quit doing business with them.  And it was only then that they started accusing ASUSTek

of infringement.

I would like you, ladies and gentlemen, to ask yourself a question:  If Force MOS really thought this was infringement, despite knowing all along what's going on, why did they wait to write the letters?  That's a question you have to answer.

Now, one other thing about this.  I recall Mr. Chung's testimony.  He suggested that when ASUSTek decided to stop doing business, that it was surprising, that it was unexpected.

Folks, nothing about this was surprising or unexpected.  DX 7, that email I showed you moments ago, that was nearly 41 pages of emails going back and forth between the parties addressing the issue.  This was no surprise.

Mr. Thane also asked Mr. Fu, well, there was never a formal termination.  Well, there was no writing, I think is what he said.  Well, how about the 41 pages of email?  How about the quality assurance agreement?

Now, there's another problem with the accusation of infringement.  This was Mr. Chung's testimony.  When Force MOS's lawyers wrote these letters accusing ASUSTek of infringement, they did so at a time when the patent was not even enforceable.  He agreed with that.  The patent wasn't even enforceable when they wrote letters threatening legal action.

But what's the even -- the greatest problem of all.  You

heard Mr. Hanba talk about it.  The fact is the Plaintiff does not own the '409 Patent, they didn't own the '409 Patent at the time they wrote the letters, and they don't own the '409 Patent today.  It was assigned to Force-MOS Technology Corporation.  Force-MOS Technology Corporation doesn't exist.

And that's not just my words.  What did Mr. Chung say?  This is what I asked him "Well, the problem, sir, is that Force-MOS technology Corp doesn't exist.  Right?

"Yes."

That's what he said.

Now, Mr. Hanba pointed to the interpretation mistake that occurred in this case, and I think -- let's face it, I think we all remember the interpreted testimony.  He pointed out that that interpreter made a mistake when translating the legal name of the Defendant ASUSTek.  And that's true.  I agree with that.  There was a mistake.  There was a mistake because he got the name wrong.  It wasn't the correct entity.

And guess what?  When there's a mistake, what do you do?  You fix it.  That's why the parties jointly agreed to approach the Court and ask for an instruction fixing it.  But the Plaintiff has never asked Dr. Hshieh to fix the assignment agreement.  It's never happened.

Instead, what they did is they asked Ming-Tao Chung, the CEO, to write some declarations to file that would attempt to go back in time and change who Dr. Hshieh tried to assign the

patent to.  But those failed.  Those failed because they were wrong, first of all.  You recall that.  Dr. Ming-Tao Chung was not the supervisor, which is what the declaration said.  He did not sign one of the other assignment agreements.  That was signed on behalf of the gentleman Ching-Cheng Chang.

He got both of those wrong in the declaration.  And why did he get those wrong in his own declaration?  Well, maybe it's because he didn't even write it.  This was the testimony that Ming-Tao Chung gave via deposition:  Sir, did you personally write this declaration?

No.

Who wrote this declaration?

The vice president of our company.

Is he also known as Rafael Chung?

Yes.

Ming-Tao Chung didn't even write that declaration.  He also didn't even review it after it was written by someone else for him, by Mr. Rafael Chung.

"Did you personally review the document, sir?

"As I said earlier, I roughly know the content within it, but I did not read it in details."

These are obvious problems with the declaration, but like I said in the questioning of the witnesses that you saw earlier this week, the biggest problem--you can't change the past.

THE COURT:  15 minutes have been used.

MR. UNDERWOOD:  Thank you, Your Honor.

And the very first question, ladies and gentlemen, on the verdict form that you will be asked to answer is whether or not the Plaintiff can prove that it acquired the '409 Patent from Dr. Hshieh.  The answer, I submit to you, is no.

So what happened after we got -- after ASUSTek got these problematic letters accusing them of infringement?  Well, ASUSTek did the responsible thing.  ASUSTek recognized that it was not the one who designed the MOSFETs, so it went to the sources.  It went to the companies who actually design and sell them these MOSFETs.

We don't have time to walk through all of these letters, but you saw them in the testimony.  There were several, several letters with extensive analysis showing how there was no infringement.  There was also the declaration of warranty of non-infringement.  This was provided by Panjit, JX 43, and it guaranteed -- it provided a guarantee to ASUSTek that there was no infringement.

Now, Force MOS is critical of ASUSTek saying, well, sure, you got a lot of letters; sure, you got the guarantee; but it was only from Panjit, it wasn't from LRC, it wasn't from Ubiq, it wasn't from Excelliance.

Well, that's a fair question---why didn't ASUSTek go to them?  The reason is simple--Force MOS only ever complained

1084

about Panjit.  This was Mr. Fu's testimony:  Did they ever identify which MOSFET was at issue?  Yes, they identified it's the Panjit MOSFET.

In fact, it wasn't until they filed this lawsuit that they even started complaining about the other suppliers.  What was ASUSTek supposed to do?  Read their mind?  That's not reasonable.

Now, Mr. McMahon is about to get up and speak with you.  There's one topic I want to cover just for a few more minutes, and that is the topic of credibility.

These are the Judge's instructions:  "You, the jurors, are the sole judges of the credibility of all the witnesses and the weight and effect to give all of the evidence."

The instructions went on, "You may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and the evidence in this case."

The way I paraphrase this one is you don't leave your common sense at the door when you walk into that jury room to deliberate.  You take that with you and you use it as part of the deliberation process.

So when it comes to credibility, Mr. Hanba mentioned this, he said opening statements are like promises, promises that you want to see can they fulfill those promises.  The Plaintiff could not.

Here's one example. This is from the Plaintiff's opening statement. Mr. Hanba said that there are hundreds of MOSFETs in each computer, hundreds in each computer. Those were the words.

What did the evidence show? Mr. Chao-Liang Hung was asked, Force MOS's counsel claimed that every ASUSTek laptop has hundreds of accused MOSFETs inside. What do you think about that claim?

It's impossible.

He's involved in R&D at ASUSTek. It's impossible.

What else was the evidence? The evidence was that the Plaintiff hired the company Microtech, Mr. Vinh Diep, to open up products and count up the MOSFETs. You know how many he found when it came to laptops? The most was 58, and some had as few as 2, but they were saying there were hundreds. Ask yourself, why were they saying that?

What else?

Your Honor, may I go to the easel?

THE COURT: You may.

MR. UNDERWOOD: This brings me to Mr. Lamotta, Mr. Plaintiff's damages expert. You will recall that when he was asked questions by Force MOS's lawyer, he talked about one number--$20 million.

THE COURT: 20 minutes have been used.

MR. UNDERWOOD: Thank you, Your Honor.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1086

It wasn't until I got the chance to ask him questions that he acknowledged, well, I've also offered opinions that it would be reasonable for a royalty to these patents to also be $6.8 million, and to also be $1.3 million.  He admitted this was in his report and he admitted he wouldn't offer anything in his report that was unreasonable.  But he didn't talk about it until I asked him questions about it.

Then Force MOS' lawyer, Ms. Pellegrino, got up and said, Well, why didn't you talk about these numbers?

He said, Well, it's because the case changes, I issued these opinions long ago, things change, evidence changes.

Well, I got up again and asked him, Sir, didn't you just issue a more recent report on February 8th in the middle of this trial?

He said, Well, yes, I did.

Weren't these numbers in that report?

Yes, they were.

Why wouldn't he show you those numbers, ladies and gentlemen?  That's a fair question to ask yourself.

The Court also instructed you in its final instructions on apportionment.  Apportionment means you can't take more value than the patents claim to attribute to the accused features.

This was Dr. Neikirk's opinion that Mr. Lamotta relied upon.  He said these patents contributed 40 percent and 13

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

percent, respectively, to MOSFETs.

Well, what did Mr. Lamotta do?  Did he take these percentages for his $20 million number?  No, he didn't.  He took 100 percent of the cost.  And he even went so far as to say that he did not apportion the cost of the individual MOSFET.

Ladies and gentlemen, the Court's instruction was that if unpatented features contribute to the accused products, you must apportion.  That's on page 27 of the instructions.  Mr. Lamotta admitted he did not.

Now, like I said, Mr. McMahon is about to speak with you.  I believe he's going to be talking about MOSFET counts, MOSFET slot counts, and the like.

When he's talking to you about those things, in addition to the evidence of non-infringement, I'd encourage you to ask yourselves this question:  Why would Force MOS pay money to a company like Microtech to open up the products, to count up the MOSFETs, only to turn around, ignore all of that, ask their witnesses to come up with estimates that inflate the numbers, and only present those inflated numbers to you?

Why would they do that, ladies and gentlemen?  That's a question you'll have to answer.

Thank you very much for your time.

Your Honor, would you like me to reposition the easel?

THE COURT:  Yes.

You have 17 minutes remaining, Mr. McMahon.  Would you like a warning on your time?

MR. McMAHON:  Yes, Your Honor, at 10 and 3 minutes remaining.

THE COURT:  10 minutes and 3 minutes remaining.

MR. McMAHON:  Thank you, sir.

THE COURT:  You may proceed.

MR. McMAHON:  Thank you, Mr. Underwood.

May it please the Court.

Good morning, ladies and gentlemen.  I'm going to pick up with where Mr. Underwood left off and talk about the component counts.  I told you on Friday to watch the counts.  I previewed that the MOSFET counts would affect credibility, and they did.

Since then, you've heard a lot about those MOSFET counts.  You've heard a lot of criticism of those MOSFET counts, suggestions that those numbers are bad.  They're not bad.  They can't be because you can't fit hundreds of MOSFETs into a device that doesn't have hundreds of slots.  It's impossible, as Mr. Hung said.

Now, this is something -- there is something that I thought Mr. Hanba might say this morning and maybe he still will.  I thought he might say that our data is flawed because of three specific MOSFETs.  Mr. Diep found them in the battery controller--two from Ubiq, one from LRC.  Not hundreds, just

three.

Mr. Hanba may present that as a big surprise.  I'm here to tell you it's not a surprise.  No less than five witnesses testified about this.  There were three accused MOSFETs in this battery controller, the blue circuit board.  ASUSTek doesn't make this; it buys it.  Mr. Diep counted it, and he found those three MOSFETs there.  You see the names of five witnesses who addressed this during the trial.  This has been accounted for.  It's not a surprise.

You may also hear about power adapters like the one here that Mr. Lamotta showed you in his slides.  But Mr. Diep considered the power adapters, and he found zero accused MOSFETs in those power adapters.  Zero, not hundreds, zero.  Force MOS has offered all sorts of speculation and accusation about the component counts.  What Force MOS has not offered is proof; none.  Just artificially inflated numbers.

Now, why would Force MOS want to inflate the counts?  Damages.  Force MOS wants to show you a big damages number--$20 million big.  We haven't heard that yet, but I expect that that's what we will hear.

What I really want to tell you is that none of that matters because there has been no infringement.  No infringement, no damages.

You heard from two experts this week on the issue of credibility.  Dr. Shanfield is the guy who actually built

trench MOSFETs, many of them.  He built and designed trench MOSFETs at Raytheon.  He built and designed trench MOSFETs at his current place of employment at Draper Labs at MIT.  He has played with their dimensions, he's played with the process that goes into making them.  Dr. Shanfield is the only expert who walked you through the process of making a trench MOSFET.

By contrast, Dr. Neikirk is the guy who has never designed or built a trench MOSFET.  Keep that in mind as we walk through the issues of invalidity and non-infringement.

Before I get to those, I do want to touch briefly on ownership.  Mr. Underwood addressed this.  The question is, Does Force MOS even own this patent?  The face of the patent shows that the only named inventor, Dr. Hshieh, assigned it to a non-existent company.

And you may remember Mr. Underwood walked through the corporate registry in the Cayman Islands where that company is supposed to be registered and found there was no record of it.

Force MOS now argues that the Patent Office approved its assignment.  We heard that for the first time during closing arguments.  There was no evidence of that.  Force MOS recorded Dr. Chung's self-serving declaration executed years after the assignment.  They recorded that with the Patent Office.  You can do that.  That's fine.  It's a lot like recording a title with the local -- the recorder's office at the county office.  The county clerk doesn't check that title to make sure it's

legally accurate.  The Patent Office doesn't check anything that's recorded there, either.  It's just for public notice purposes.

So the question is, has Force MOS met its burden of proving to you that it actually owns this patent that it brought to court to enforce?  If not, then you don't need to answer any other questions about the '409 Patent.  You're done with that one.  But I'm going to talk to you about the other questions anyway so that you have the information that you need to decide the issues in this case.

On Friday morning, you-all watched a video from the Federal Judicial Center about the patent system.  For some of you, that might have been your very first introduction to patents.  In that video you heard the judge say that sometimes the Patent Office makes a mistake.  We all do.

For example, sometimes the Patent Office does not have all of the information it needs such as prior art that the examiner did not consider or locate.  This is one of those cases.  We are here to defend ourselves against Force MOS's allegations, and we have a right to challenge the '409 Patent in court.  It will be your job to decide whether the claimed rounded corners were already known.

You heard Dr. Neikirk admit that the patent examiner who allowed the '409 Patent did not consider the Kobayashi or Hshieh prior art references.  Both of them described rounded

1092

corners.  The patent examiner undisputedly did not consider those references.

Now, remember this is a topic on which Dr. Shanfield and Dr. Neikirk actually have a lot of agreement, a lot of common ground.  Remember this checklist?  We did this on the board when Dr. Shanfield was testifying, and I actually asked Dr. Neikirk about it, too.  I'm showing it to you on the screen so you can see it a little bit better now.

Dr. Shanfield presented this, and the checklist documents where every feature of the '409 Patent claim 1 had already been described in the Kobayashi prior art.  Just yesterday Dr. Neikirk said he has no dispute with Dr. Shanfield on all but one of those features.  There is no dispute that Kobayashi described every feature that you see highlighted here on the screen.  The only feature that Dr. Neikirk disputes is substantially square-shaped cells with rounded corners.

So let's take a closer look at that one.  Figure 3A of Kobayashi shows a top view of cells that are undisputedly square.  No question about that.

THE COURT:  Ten minutes remaining.

MR. McMAHON:  Thank you, Your Honor.

Figure 6C shows the side view.  Dr. Neikirk admitted that from the top view, we are looking down into the trench openings, and the Kobayashi text says that the corners of each trench at an opening portion may also be rounded.  It's

optional.  So Kobayashi doesn't show it in the figures, but the text of that sentence is pretty clear--the corners at the opening may be rounded.

Now, Force MOS now argues that the gates are not the cells, but the gates surround the cells.  If the corners of the gates are rounded, then so are the corners of the cells.  Dr. Neikirk says Kobayashi does not describe substantially square-shaped cells with rounded corners.  Is that credible?

Now, maybe you want to see a drawing of the rounded corners.  That's fine.  Dr. Shanfield showed you that, too.  In the Hshieh prior art, here we see figure 8a and even Dr. Neikirk agreed in that figure all four corners are actually rounded.  Dr. Shanfield told you that it would have been obvious to add the rounded corners to Kobayashi's square cells?  Why?  Dr. Shanfield spoke from personal knowledge.  He said that it would have been obvious to combine Hshieh's rounded corners with Kobayashi's square cells to make the device more rugged and avoid punch-through.  That's exactly what the Hshieh prior art says.

It's also exactly the same problem that the '409 Patent set out to solve.

Now, we'll show you a photo of the checklist that--if we go to the next slide--that Dr. Shanfield used to show the combination of these references.  So have we proven by clear and convincing evidence that claim 1 of the '409 Patent is

invalid?  That's one of the questions for you to decide.

As you consider that question, remember Dr. Shanfield is the only expert you heard from who has designed and built trench MOSFETs.

Now, I'd like to turn to the question of infringement on which Force MOS bears the burden of proof.  Remember that Dr. Neikirk showed you a lot of images.  We can see one here.  In most of them, Dr. Neikirk chose to paint over the SEM with lots of colors.  Dr. Neikirk added those colors.  The painted colors did not come from the SEM machine and neither did Force MOS's fancy animations.

What came from the SEM machine is the black-and-white image that we see here.  When we removed the paint and looked at that, we saw that the MOSFET devices had been aggressively etched with hot acid.  Mr. Hanba reminded you during opening that a picture is worth a thousand words.  It sure is.  This picture shows you that Force MOS destroyed the samples.

Even Dr. Neikirk admitted that the process is destructive and alters the device.  He admitted it.  How can images of altered samples be credible?

Dr. Shanfield walked us through image after image after image.  Every one of them included those telltale black patches indicating that the damage caused by the hot acid just like the image that Mr. Hanba showed you today.  Those black patches are voids.  The material that was there has been

removed.  Dr. Shanfield said that the acid attacked the sample.

Dr. Shanfield acknowledged that the corners in those images might look rounded, but that is because the acid attacked the gates, completely removing them and leaving black voids behind.  How can Force MOS satisfy its burden of proving infringement if it destroyed the very things that we're supposed to be looking at?

The answer from Dr. Shanfield summed up Force MOS's infringement evidence on the '409 Patent.  What, if anything, do we know about the shape of the cells before the aggressive etch?  Nothing; absolutely nothing.

Turning to the '634 Patent, Force MOS came up empty again.  Remember that this patent requires the lateral contact layer, and the Court interpreted that phrase to require P* doping.  Again, Dr. Neikirk showed you a bunch of painted over images, but none of those matter.  Why not?  Because SEMs tell us nothing about doping concentrations.

Remember, Mr. Diep said that.  He is the SEM guy that Force MOS hired to create these images.  He said SEMs do not give us doping concentrations, but he wasn't alone.  Both of the technical experts in this case agreed with him. Dr. Neikirk agreed as you can see here and Dr. Shanfield agreed with them as well.

How can it be credible for Dr. Neikirk to cite SEMs as

1096

evidence of P* doping when all of the technical witnesses agree that those images can't show you P* doping?

Even beyond SEMs, Dr. Neikirk admitted that he did not show you any measurement of doping levels in the accuse MOSFETs; not a single measurement.  The most important and disputed issue and feature of the '634 Patent is P* doping.  And Dr. Neikirk didn't show you a single measurement.  He admitted it.  So ask yourself, how can Force MOS meet its burden of proving infringement without even trying to measure for P* doping, which the Court says the claim requires?

Now, you just heard Force MOS try to shift the burden of proof.  Force MOS suggests that ASUSTek and Dr. Shanfield must prove non-infringement.  Once again, Force MOS is not taking responsibility.  This time it's the plaintiff that bears the burden of proving infringement.  Is that credible?

I'd like you to walk through the verdict form that you'll be asked to complete at the end of deliberations.  It will include five questions.  You'll see them here.  I'll go through them one at a time.

Question 1, ownership, the only evidence we have seen is that Dr. Hshieh assigned the '409 Patent to a company that does not exist, not to the Plaintiff.  Force MOS has not shown you any other assignment from Dr. Hshieh.  If you answer no to Question 1, then you don't have to answer any other questions about the '409 Patent.  You're done with that one.  And we ask

you to answer this question no.

On infringement, Force MOS bears the burden of proving it with credible evidence.  For the '634 Patent, Force MOS gave you no measurements of P* doping.  For the '409 Patent, Force MOS showed you samples altered by acid.

Please remember the Court's instructions for indirect infringement, too.  For indirect infringement, Force MOS must prove that ASUSTek knew its products infringe.  We ask you to answer both of these questions no.

Question 3 is invalidity.  I've already covered that.  Dr. Shanfield showed you the evidence.  Much of it is undisputed.  That which isn't undisputed is clearly shown in the references.

THE COURT:  Three minutes remaining.

MR. McMAHON:  We ask you to answer this question yes.

The final two questions are about willfulness and damages.  You only need to address those if you find that there's any infringement.  Willfulness is about whether ASUSTek acted reasonably when it was accused of infringement.

You know what damages is about, and you'll hear more about that shortly, but there is no damages if there's no infringement.

Now, this is our last chance to speak with you before you deliberate.  Mr. Hanba will stand back up now, and we will

1098

have no chance to respond to what he says.  As you listen, please consider the question I asked you for the first time on Friday--where's the proof?

Mr. Underwood and I told you on Friday that we've been wrongly accused; we are here to defend ourselves.  You heard the Court instruct you this morning that we're entitled to do that, but we cannot do it alone.  I'm now asking each of you for your help.

We are putting the case in your hands.  We ask you to return a verdict that there has been no infringement and that claim 1 of the '409 Patent is invalid.

Thank you, ladies and gentlemen.

THE COURT:  All right.  Mr. Hanba, you have 18 minutes and 9 seconds remaining.  Would you like any warning for your final closing argument?

MR. HANBA:  Yes, Your Honor, two minutes, please.

THE COURT:  I'll warn you with two minutes remaining.  You may proceed with Plaintiff's final closing argument.

MR. HANBA:  May it please the Court.

Ladies and gentlemen, now I'd like to talk with you about the economic harm that's been caused by ASUS's infringement.  The damages case comes down to a single issue--did ASUS keep reliable records of the infringing components they used in their components -- in their products, excuse me.

1099

ASUS will tell you, yes, they did.  Force MOS will say they didn't.  This was previewed in opening.  Remember, ASUS's counsel told you to watch the counts, watch the counts.  So let's start there.

We've seen JX 7 a few times, what ASUS has called its maximum count spreadsheet.  During opening, ASUS's counsel compared this data to the Cracker Barrel game you saw.  He said that there are only so many slots in the peg game, just like there are only so many in a motherboard, and the spreadsheet gives you the maximum amounts that you can use.  Now we know that isn't true.

Last Friday we heard from Mr. Hung and you heard his testimony via video deposition where he was asked, "Looking at this spreadsheet, you cannot tell whether any of the accused components listed in column F through N is used in the products shown in columns A through E?"

He answered, "Correct."

He was then asked, "Does ASUS have any BOM that definitively tells you which MOSFET is in which ASUS device?"

His answer, "ASUS doesn't have one -- doesn't have such a BOM."  And we all remember a B-O-M is bill of materials.

And what did we hear in opening?  We heard ASUS's counsel say, There are 15 golf tees that you can play with this board game.  There are 15 slots in the board.  And the golf tees fit into the slots, 15 tees, 15 slots.  I can't fit more than 15

tees in this game because there are only 15 slots. So counsel wants us to believe that, using his analogy, in the accused products there are only 15 slots.

But what they don't address at all is testimony from Mr. Hung when he came here live on Tuesday. He was also asked, "So if the supplier of a battery used a MOSFET, you wouldn't know so long as the battery met your requirements. Right?"

And Mr. Hung answered, "That's correct.

"Would the same be true for a power adapter?

"That's correct." And he said the same for a camera and a panel and a touch pad.

So let's go back to that peg game. We would need to add an additional board for the battery, the power adapter, the panel, the touch pad, and the camera. Make no mistake--all of these are inside that accused product that you saw in opening and that's on the top of your screen there.

There was some testimony on the number of MOSFETs in the battery. I think it was at least two but not more than 10. ASUS doesn't know the exact number, but they have a range. But that's really -- what's really interesting is that for the remaining four components--the power adapter, the panel, the touchpad, and the camera--ASUS failed to provide a shred of evidence for how many MOSFETs or how many slots are in that -- those items. ASUS never addressed those. It provided no data, gave no testimony, asked no questions.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

ASUS even flew Mr. Hung all the way from Taiwan -- remember, he made a really big deal that it took him 24 hours to get here.  Don't you think they could have had their director of research and technology tell us how many slots are in the accused products for those?  But they didn't, because ASUS doesn't know.  Nobody knows.

In fact, in his deposition, Mr. Hung said that the spreadsheet does not list any accused components used in any of the accessories such as batteries, power supplies, or display panels.

Ladies and gentlemen, ASUS doesn't know how many slots are in the accused products or how many accused MOSFETs are in its products.

In opening, ASUS's counsel told you that Force MOS would say that ASUS's products can hold more MOSFETs than there are slots.  Well, now you know why, and it isn't very complicated. ASUS tried to convince you that we're only playing one peg game in this case, and now we know that isn't true.  We would need six JX 7 spreadsheets to cover all of the ASUS components containing the accused MOSFETs, and ASUS simply did not provide this information.  The data simply isn't reliable.

So we know that ASUS didn't tell you how many MOSFETs or slots are in these other products, but let's look at that limited data ASUS did tell you about.

You heard Mr. Hung testify about JX 7 when he said if

there is not a Y in one of the columns listing the accused components, it is not possible for that MOSFET to appear in the product.  It's not possible; that's what he told you.  But the evidence -- what the evidence showed is that even the limited data set is wrong.

See, Mr. McMahon told you I might come up here and tell you about some product that shows their data is in JX 7, but I'm not sure why he thought that.  I'm going to show you and I'm going to tell you about a graphics card that they didn't show you, that they didn't tell you about just now.

You remember you saw PX 42.  It's a graphics card.  It doesn't have a battery.  It was a tear-down image of an ASUS graphics card.  It's the PH-GTX.  Now, in JX 7, ASUS told you it was not possible for this product to have one of the accused components in this case, the Panjit 2N7002K.  I've highlighted that on the right.  There are no Ys in that count.  Again, this is a graphics card so it doesn't have a battery.  We can -- what you see is what you get.  But let's take a closer look at the accused components in this product.

You remember from the evidence we showed you in this case, the marking for the Panjit chip, the 2K chip, is K72.  And right there in the product ASUS told you it was not possible for these components to be in we see two.  Right there.  Who are you going to believe?

Even the limited data ASUS provided in this case is not

accurate.  And you may wonder why the data's wrong.  It's because the lawyers created it.  And you heard testimony from Mr. Fu about this data -- about how this data was created and that it wasn't verified.

So when we get back to the question of did ASUS keep reliable records, and that's the central part of the damages, the answer has to be no.  They did not keep reliable records.  They did not present any records.  They don't know the number of their MOSFETs in their own devices.

And, importantly, too, ASUS doesn't know the mix of MOSFETs.  You heard Mr. Ugone, ASUS's damages witness, during cross examination yesterday.  He was asked, "And ASUS does not know the mix or combination of MOSFETs in the accused products?"

He answered, "I will agree with that."

We heard from Mr. LaMotta how important that mix is.  Right?  There's a 25 times -- or 2500 percent difference in price between all of those MOSFETs.  That data is critical and ASUS has admitted they don't know it.

In summary, ASUS doesn't know how many MOSFETs are in their products, even the data it did provide is wrong, and they don't know the mix in their accused products.  The data in this case is unreliable.

And remember, Dr. Ugone relied on that data.  He said, "And the damages" -- When asked, "And the damages opinion that

you've offered in this case is based on the belief that JX 7 is reliable. Correct?"

He answered, "Correct."

Dr. Ugone was asked, "If the jury determines that that data is unreliable, you have not offered a damages opinion based on the unreliable records approach set forth by Mr. LaMotta. Correct?"

And he said, "I'll agree with that."

Ladies and gentlemen, because the damages are unreliable and because that data -- excuse me. Because that data is unreliable, we're only left with Mr. LaMotta's analysis based appropriately on the unreliable records approach. There's no other one. There's no other opinion based on this approach.

You might ask, If the data is unreliable, why do they have to continue the hypothetical negotiation then. Well, because the law tells us we have to. The parties have to reach an agreement. No one can walk away until they do.

If you'll remember, Mr. LaMotta showed revenue for the accused products. Here we have desktops--I'll round the top one to $500 million; notebooks, $5.5 billion; motherboards, $1.2 billion; servers, $271 million; and graphics cards, $1.7 billion. Mr. LaMotta told us under this approach you multiply the revenue by the apportionment.

Apportionment gets us to another topic, and that's Dr. Neikirk's estimates. There's been a lot of discussion

throughout this trial of where did these estimates come from. Dr. Neikirk told you he based his estimates on a number of sources.  One was Mr. Diep's count of five of the accused products.  Dr. Neikirk considered that and he also considered the ASUS spreadsheet.  The fact that his estimates don't match either is exactly because he took both into account to form the basis of his estimates.

Further, as a check, when JX 7, that part 2 came out, Dr. Neikirk compared his estimates against the new data and he found that part 2 was even higher than part 1.  But Dr. Neikirk didn't release his -- didn't increase his estimate even though ASUS's data increased.  And this is another one of the reasons why Dr. Neikirk's estimates are conservative.

So why do we have to use estimates?  Well, Mr. LaMotta told us exactly why.  He said, "So if ASUS doesn't know, how do you go about figuring this out?"

He answered, "So we do what we do when you don't have actual data--we use estimates."

Mr. LaMotta then detailed those -- how those estimates were used in determining his apportionment.  We see the values he came up with by doing the detailed work.  When you multiply by the apportionment, you get $20.1 million.  This is the only amount Mr. LaMotta presented.  This is the only unreliable damages opinion in this case.

As you heard from the Court's instructions, you must use

your sound discretion in fixing a damages -- an award of damages, drawing reasonable inferences where you find them appropriate from the facts and circumstances in evidence.

The damages award, if any, must be adequate to compensate Force MOS for any infringement you find.

So when you fill out that verdict form and reach Question 5, what damages would compensate Force MOS for the damage caused by ASUS's infringement, I trust that based on the evidence you'll see why the answer is $20,108,275.

You have -- before I sit down I want to go back to the beginning, to the opening statements and remind you of something that was said, and that's how important credibility is.  ASUS's counsel talked about it.  You were told to look witnesses in the eye and determine how credible they are. Here's a few things to think about as ASUS is presenting its closing argument--excuse me--as you go back to deliberate.

We heard at opening, remember when I told you earlier that the slots, the MOSFET slots would play an important role in the credibility, we couldn't agree more.  As I mentioned earlier, ASUS brought witnesses from Taiwan, flew them here to testify, and not a single one provided a shred of evidence as to the number of MOSFETs or even slots in the power adapter, the panel, the touchpad, or the camera.  There hasn't been any testimony about the amount of MOSFETs in those components--none--all of which are in an ASUS laptop.  So for

that simple reason alone, the numbers are incredibly reliable.

During ASUS's closing argument we heard a lot about the ASUS employees and how they verified JX 7.  One of the ways I like to look at credibility of the statement is to use a then and now test--what did somebody say back then when there was no penalty for telling the truth versus now when they're in court having been caught for infringement and facing a damages number of $20 million.  Let's see how consistent the statements are.

So I know you've seen this before.  Mr. Hung, the director of research and development, said in his sworn deposition before he got here when he was asked, "Does ASUS have any BOM that definitively tells you which MOSFET is in which ASUS device?"

Mr. Hung repsonded.  "ASUS doesn't have one -- doesn't have such a BOM."

This is the director of research and development before he got here.  He wouldn't know if he had one.

Months later he shows up at trial and what does he say? "Mr. Hung, did you have a chance to verify the information in this exhibit against the information in the BOM?"

"Yes."

Ladies and gentlemen, what BOM is he talking about?  He was under oath in both situations, yet there is no world in which both of these statements can be true.

Mr. Fu was asked --

THE COURT:  Two minutes remain.

MR. HANBA:  "Where does the data in the spreadsheet come from?

"The data is combined bill of material.  It comes from ASUSTek and also the data.  I think part of the data is sales data, which is from ASUSTek Computer International."

Again, when he was under oath, he came here and then he was asked, "Where does this data in the spreadsheet come from?

"The data is combined bill of material that's come from ASUSTek and also the data.  I think part of the data is the sales data."

Ladies and gentlemen, you get to decide what evidence is and what statements should be given weight and what should be deemed credible.

Mr. Underwood said this case is about responsibility.  And we couldn't agree more.  A couple of prospective jurors talked about smoke and mirrors during the jury selection process, and I'm confident you can see your way through the smoke and can see what ASUS is trying to do.

Thank you very much for your service.  I know you'll do a great job deliberating.  Force MOS and I thank you for your time and your attention this week.

THE COURT:  All right, ladies and gentlemen, I have a few final instructions to give you before you begin your

deliberations.  You must perform your duty as jurors without bias or prejudice as to any party.  The law does not permit you to be controlled by sympathy, prejudice, or public opinion.  All parties expect that you will carefully and impartially consider all the evidence, follow the law as I have given it to you, and reach a just verdict regardless of the consequences.

Answer each question in the verdict form based on the facts as you find them to be, following the instructions the Court has given you about the law.  Again, do not decide who you think should win the case and then answer the questions to reach that result.  Once again, your answers to the questions in the verdict form must be unanimous.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding similar stations in life.  This is true in patent cases between corporations, other business organizations, partnerships, or individuals.  A patent owner is entitled to protect his rights under the laws of the United States, including bringing a suit in a United States District Court for money damages alleging infringement.  And by the same token, ladies and gentlemen, an accused infringer is entitled to defend itself against assertions of infringement, including by arguing that it does not infringe the asserted patents and that the asserted patents are invalid.  The law

recognizes no distinction between types of parties, and all corporations, business organizations -- other business organizations, partnerships, and individuals stand equal before the law.

Now, when you retire to the jury room to deliberate on your verdict, as I've told you, you'll each have your own printed copy of these final jury instructions that I've given you orally this morning.  If during your deliberations you desire to review any of the exhibits which have been admitted into evidence over the course of the trial, you should advise me by a written note signed by your foreperson and delivered to the Court Security Officer, and then I will send that exhibit or those exhibits to you.  I'll remind you the demonstratives are not exhibits and I cannot send you demonstratives.  I can, and if you ask me to I will, send you exhibits.  Now, once you retire you should select your foreperson and then conduct your deliberations, and if you recess during your deliberations, continue to follow all the instructions I've given you about your conduct as jurors during the trial.

After you have reached a verdict, your foreperson is to fill in the answers to those questions in the verdict form reflecting your unanimous decisions, sign the verdict form on behalf of the jury, date it, and then advise the Court Security Officer that you've reached a verdict.  Do not reveal

your answers on any of the questions in the verdict form until such time as you are discharged, unless otherwise directed by me.  And you must never disclose to anyone, not even to me, your numerical division on any unanswered question.

Now, any notes you've taken over the course of the trial are aids to your memory only.  If your memory should differ from your notes, rely on your memory and not your notes.  Notes are not evidence, and a juror who has not taken notes, or who has taken only few notes, must rely on their own recollection of the evidence and should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

Now, if you want to communicate with me at any time during your deliberations, you should give a written message or a question signed by your foreperson to the Court Security Officer who will bring it to me, and I'll then respond as promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally.  And I will always first disclose to the attorneys in the case your question and my answer before I respond to any question you might send me.

Now, after you've reached a verdict and I have accepted your verdict and discharged you as jurors, at that point, ladies and gentlemen, you are not required to talk with anyone

about your service in this case.  But at that point you will be completely free, if you choose to, to talk with anyone of your choosing about your service as jurors in this case.  At that point it will be 100 percent your own individual decision.

I'm now going to hand eight printed copies of these final jury instructions and one clean copy of the verdict form to the Court Security Officer to deliver to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate upon your verdict.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, you are welcome to wait here in the courtroom.  If you choose to wait off premises, don't be far away, and make sure that your cell phones are on so that when we call you you can get back here quickly in the event we either get a note or a question from the jury or when we receive the return of their verdict.

Awaiting either a note from the jury or the return of their verdict, we stand in recess.

(Jury deliberates.)

THE COURT:  Be seated, please.

All right, counsel.  I've received the following note from the jury.  I'll read it into the record.  I'll then hand the original to the Courtroom Deputy, an I also have a copy for each of the trial teams which you can approach and get

after I've read it into the record.

Their note reads -- the jury's note reads as follows: "We would like to see pictures of Kobayashi '196 and Hshieh '914 Patents."  Then there's a space, and it continues.  "Does the JX 7 represent global sales or U.S. sales?"  And it's signed by Ms. Neal, Juror No. 7 as the foreperson.  That's the entirety of the note.

I'll hand the original to the Courtroom Deputy, and then I have a copy for each Plaintiff and Defendant, if you want to approach and get that.

I have already asked the Courtroom Deputy to pull JX 24 and 25, which are the two references they asked for in the first part of the note.

I will read you what I have tentatively prepared as a response with regard to JX 7 and then I'll be glad to hear your comments.

The written response I have at present says, "Members of the jury, in response to Jury Note No. 1, I am sending you the following:  1, Exhibit JX 24, which is the Kobayashi '196 Patent/reference, and 2, Exhibit JX 25, which is the Hshieh '914 Patent/reference.

"As to JX 7, this lengthy spreadsheet, a small portion of which was shown to you during the trial, does not expressly show either U.S. or global sales.  It identifies the various MOSFETs that relate to various accused products."

1114

Now, I'll be happy to hear from both Plaintiff and Defendant as to this proposed response and whether there are any problems or objections with regard to what I've suggested.

MR. HANBA:  Your Honor, no objection to Kobayashi or Hshieh.  And JX 7 actually is U.S. sales.  It includes the slots, but it is -- also includes a column for U.S. sales.

THE COURT:  Well, I think both sides recognize that JX 7 in its entirety is a very, very large document, and I am not at all sure that either side benefits by sending the entirety of that document to the jury.  And I think everybody will agree a small portion of that was shown during the trial, and there is probably a disagreement between the parties as to what it is and what it means.

So I'm happy -- the jury note -- the note from the jury does not ask for a copy of JX 7; it just simply asks does JX 7 represent global sales or U.S. sales.

Mr. McMahon, what comments or observations can you offer?

MR. McMAHON:  Your Honor, I was inclined to go along with your original proposal, quite frankly.

THE COURT:  What's your problem with the original proposal, Mr. Hanba?

MR. HANBA:  We showed the sales portion of that spreadsheet in the damages presentation, Your Honor, with Mr. LaMotta.

THE COURT:  I'm trying to recall whether it was

1115

clearly identified as either U.S. sales or global sales, and I don't have any clear recollection of that. That's the question they asked. It seems like to me the spreadsheet in its entirety is really not just U.S. sales or clearly all global sales; it seems it really is more a spreadsheet that ties the various MOSFETs to the various accused products. So --

MR. HANBA: But Your Honor, the right column includes the sales data, and so that's the column -- it was produced in response to document requests as to U.S. sales, so -- but we showed that right column that had the sales data as part --

THE COURT: I don't see either of the IT people in the courtroom. I guess there's no way somebody could put part of the spreadsheet up on the monitor so we could all have the benefit of seeing it. Anybody present got that capability?

Let's go off the record while we see what we can and can't do.

(Pause in proceedings.)

THE COURT: All right. Let's go back on the record.

Based on discussions had with counsel off the record during which each side indicated to the Court they agreed JX 7 represents U.S. sales, I am modifying the Court's proposed written response to Juror Note No. 1 to read as follows: "Members of the jury, in response to Jury Note No. 1, I am

sending you the following:  1, Exhibit JX 24, which is the Kobayashi '196 Patent/reference, and 2, Exhibit JX 25, which is the Hshieh '914 Patent/reference.

"As to JX 7, the parties agree that JX 7 represents U.S. sales."

Dated and signed.

Any objection to that from the Plaintiff?

MR. HANBA:  No objection, Your Honor.

THE COURT:  Any objection to that from the Defendant?

MR. McMAHON:  No objection, Your Honor.

THE COURT:  All right.  I have JX 24 and JX 25, and I'll put the signed original of that written response with it. I'll deliver it to the Court Security Officer and instruct him to deliver it to the jury, and I'll hand a duplicate signed original of that written response to the Courtroom Deputy for the Court's files.

Now, awaiting either another note from the jury or return of their verdict, we stand in recess.

(Deliberations continue.)

THE COURT:  Be seated, please.

Counsel, I've received the following message from the jury.  "We have a verdict."  Signed by Juror No. 7, Ms. Neal, as the foreperson.

I'll hand the original message to the Courtroom Deputy,

and I'll ask if there's anything that needs to be raised with the Court before I bring in the jury and receive their verdict.

MR. HANBA:  No, Your Honor.

MR. McMAHON:  No, Your Honor.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Be seated, please.

Ms. Neal, I understand you're the foreperson of the jury.

THE PRESIDING OFFICER:  Yes, sir.

THE COURT:  Has the jury reached a verdict?

THE PRESIDING OFFICER:  We have.

THE COURT:  If you'll hand the verdict form to the Court Security Officer who will bring it to me.

THE PRESIDING OFFICER:  Thank you.

THE COURT:  Ladies and gentlemen of the jury, I'm going to announce the verdict into the record at this time, and I'd like to ask each one of you to listen very carefully as I do that, because after I have announced the verdict into the record, I'm going to poll the members of the jury to make sure and confirm that this is, in fact, the unanimous verdict of all eight members of the jury.

So turning to the verdict form and beginning on page 4 where Question 1 is found, "Did Force MOS prove by a

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

preponderance of the evidence that it acquired all rights in the '409 Patent from Dr. Hsieh?"

The jury's answer is, "Yes."

Turning to page 5 where Questions 2A and 2B are found, Question 2A, "Did Force MOS prove by a preponderance of the evidence that ASUSTek infringed any of the claims 1 through 3 of the '634 Patent?"

The jury's answer is "Yes."

Question 2B, "Did Force MOS prove by a preponderance of the evidence that ASUSTek infringed claim 1 of the '409 Patent?"

The jury's answer is "Yes."

Turning to page 6 of the verdict form where question 3 is found, "Did ASUSTek prove by clear and convincing evidence that claim 1 of the '409 Patent is invalid?"

The jury's answer is "No."

Turning to page 8 where Question 4 is found, "Did Force MOS prove by a preponderance of the evidence that any infringement you have found was willful?"

The jury's answer is "Yes."

Turning to page 9 of the verdict form where Question 5 is found, "What sum of money, if paid now in cash, has Force MOS proven by a preponderance of the evidence would compensate it for its damages as to any infringement you have found?"

The jury's answer is "$10,500,000."

Turning to page 10, which is the final page of the verdict form, I find that it is dated with today's date and it is signed by Ms. Neal as foreperson of the jury.

Ladies and gentlemen of the jury, let me poll you to make sure that this verdict is, in fact, the unanimous verdict of all eight members of the jury.  If this is your verdict as I have read it, would you please stand up?  Thank you.  Please be seated.

Let the record reflect that all eight members of the jury immediately rose and stood in response to the Court's question to poll the jury.  This confirms that this is, in fact, the unanimous verdict of all eight members of the jury.

The Court accepts the jury's verdict and I'll hand the original verdict form to the courtroom.

Ladies and gentlemen of the jury, this now completes the trial of this case.  From the very beginning I have instructed you time and time again about your conduct, what you can do, what you can't do, and all the things that are necessary to conduct a trial such as this pursuant to the rules of civil procedure and the other requirements under which the Court operates.  I am now releasing you from all those instructions, having accepted your verdict, I am discharging you as jurors, and that means you are no longer bound by any of the instructions or directions that I've given you.  Said another way, you're free to talk to anybody you want to about this

experience, and you're also free not to talk to anybody about this experience. Whether you do or you don't, it is 100 percent your choice.

I will tell you that there is a tradition in this courthouse that's been in place for over 30 years, because I've been here and seen it happen, and that is there's one way in and there's one way out of this courthouse, and that's up and down the front steps. Do not be surprised when you leave the building if there are not a lot of lawyers standing on the sidewalk at the bottom of those steps making themselves conveniently available if you would like to stop and have a conversation with them about your service as a juror. They are not able to initiate a conversation with you, they are not going to get in your way, but they are going to make themselves convenient in case you want to stop and talk to them.

If you do, they will visit with you as long as you want, I promise you, whether it's on the Plaintiff's side or the Defendant's side; and if you don't want to talk to any of them, they're not going to impede your passage in any way, and you can just simply walk on by and go to your cars and do whatever you want to do. But I want you to be aware it's entirely likely you're going to see a good representation of these two trial teams on those front sidewalks -- or on the front sidewalk when you leave the building.

1121

Now, I'd like to ask you for a personal favor before you leave the building, now that the trial is over, now that I have accepted your verdict and discharged you as jurors. Rather than you immediately getting up and leaving, I'd like you to go back into the jury room for just a couple of minutes and let me come into the jury room, because now that the trial is over I can speak to you directly, and I would like the honor of shaking each hand and looking each one of you in the eye and thanking you personally for your service as jurors in this case. I think the sacrifice you've made and the public service you've rendered warrants that, and I would consider it a personal honor if you'd give me just a few minutes to come in and thank you in person before you leave. I promise not to keep you long, but I would consider it an honor if you would give me an opportunity to tell you how much the Court appreciates what you've done because, quite honestly, ladies and gentlemen, without citizens like you that will make the sacrifice necessary to serve on juries like this, we could not operate, we could not discharge our obligation under the Constitution, and we would be unable to do what the law requires us to do. You are an essential part of the process, and the sacrifice you've made I think warrants a special word of thanks before you leave.

So if you would do that, again, I promise not to keep you, but I would consider it a personal honor if you would

give me that opportunity.

As I've said, counsel, that completes the trial of this case.  I've accepted the jury's verdict and discharged them. Counsel, you are excused.

And the Court stands in recess.

(The proceedings were concluded at 2:01 p.m.)

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                    02/13/2025

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter